UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * * *

UNITED STATES OF AMERICA,

      Plaintiff,

-vs-                      Case No. 15-CR-54-WMC-2

AMADOU CAMARA,         Madison, Wisconsin
                          February 2, 2016
      Defendant.         1:20 p.m.

* * * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF SENTENCING HEARING
HELD BEFORE CHIEF JUDGE WILLIAM M. CONLEY,


APPEARANCES:

For the Plaintiff:
                Office of the United States Attorney
                BY:  ROBERT ANDERSON
                Assistant United States Attorney
                660 West Washington Avenue
                Madison, Wisconsin  53703

For the Defendant:
                Dutch Law Office
                BY:  GREGORY DUTCH
                131 West Wilson Street, Ste. 1201
                Madison, Wisconsin  53703

Also appearing:
                Amadou Camara - defendant
                Jessica Harris - US Probation Officer

Lynette Swenson   RMR, CRR, CRC
U.S. District Court Federal Reporter
United States District Court
120 North Henry Street, Rm. 520
Madison, Wisconsin  53703
608-255-3821

1          (Proceedings called to order.)

2          THE CLERK:  Case Number 15-CR-54-WMC-2.  *United*

3 *States v. Amadou Camara* called for a sentencing hearing.

4 May we have the appearances, please.

5          MR. ANDERSON:  The United States appears by

6 Assistant U.S. Attorney Robert Anderson.

7          MR. DUTCH:  Good afternoon, Your Honor.

8 Mr. Camara is present in court with his attorney Greg

9 Dutch.

10          THE COURT:  Very good.  We are here for the

11 sentencing of Amadou Camara.  I apologize for my delay in

12 coming out.  These series of cases have been difficult

13 ones, Mr. Camara's case not least among them.  My first

14 obligation, Mr. Camara, is to confirm that you have read

15 and discussed the presentence report, the revised

16 presentence report, and the addendum to that report with

17 your counsel.

18          THE DEFENDANT:  Yes, Your Honor.

19          THE COURT:  And have you had an opportunity to

20 review the proposed conditions of release, to the extent

21 they may apply here?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Very good.  I understand the

24 government is moving for an additional one-level

25 reduction for acceptance of responsibility?

1          MR. ANDERSON:  That's correct.

2          THE COURT:  And I will grant that motion, along

3    with the defendant's motion to seal his sentencing

4    memorandum.  With those preliminaries, I will accept the

5    plea agreement, finding that the offense of conviction

6    adequately reflects the defendant's criminal conduct and

7    the plea agreement does not undermine the statutory

8    purposes of sentencing.

9          In determining the defendant's sentence, I will take

10   into consideration the advisory sentencing guidelines and

11   the statutory purposes of sentencing that are set forth

12   at Section 3553(a) of Title 18.

13         First as to the guidelines, the defendant filed two

14   objections to the presentence report.  The first, he

15   objected to the inclusion of a 40-pound load of marijuana

16   in his drug quantity analysis, stating that he did not

17   believe he was involved in that transaction and was

18   elsewhere when the transaction occurred.  Corroborating

19   witness statements reflect that the defendant was

20   minimally an investor in that load, whether or not

21   physically present for that specific transaction.

22   Moreover, given the principal role the defendant played

23   in this conspiracy, the amount was reasonably foreseeable

24   to the defendant, well within the scope of the conspiracy

25   to distribute marijuana and correctly included in the

1    drug quantity analysis under Section 1B1.3(a)(1).  The

2    combined weight of the marijuana attributable to the

3    defendant's relevant conduct is therefore conservatively

4    between 100 and 400 kilograms of marijuana.

5        The defendant also objected to the four-level

6    increase given his role in the offense as an organizer,

7    leader, manager or supervisor of criminal activity

8    involving five or more participants.  He has already

9    acknowledged that a two-level aggravating role

10   enhancement does apply.  Over the course of the

11   conspiracy, the investigative materials showed that the

12   defendant helped organize a conspiracy with Enis Gashi,

13   recruited drivers, supplied the money and vehicles to the

14   drivers and transporters, flew to California to broker a

15   deal, and received the marijuana for distribution upon

16   the driver's return to Wisconsin.  Accordingly, I have

17   little trouble finding that a four-level enhancement

18   under Section 3B1.1(a) is appropriate for this defendant.

19       Given these rulings, I find that the probation

20   office has calculated the advisory guidelines correctly

21   using the current guidelines manual and the supplement as

22   well as taking into account all relevant conduct pursuant

23   to Section 1B1.3.  The guideline for conspiracy with

24   intent to distribute and possess with intent to

25   distribute marijuana in violation of Section 841(a)(1)

1   and 846 of Title 21 is found at Section 2D1.1.  That

2   section provides an offense involving at least 100

3   kilograms but less than 400 kilograms of marijuana as a

4   base offense level of 24 pursuant to Section 2D1.1(c)(8).

5   No other Chapter 2 adjustments apply.

6       With a four-level increase warranted under Section

7   3B1.(a) [verbatim] because the defendant was an organizer

8   within this conspiracy for reasons I've already

9   explained, his total offense level is 28.  However, the

10  defendant qualifies for a three-level downward adjustment

11  under Section 3E1.1, having demonstrated acceptance of

12  responsibility for his offense, both by pleading guilty

13  and by returning to this country to do so and by virtue

14  of the government's motion for an additional one-level

15  reduction.  This leaves the defendant with a total

16  offense level of 25 and a criminal history category of I

17  and an advisory imprisonment range of 57 to 71 months,

18  and that is where the Court begins to address sentencing.

19      The defendant is different from the others who have

20  been before the Court, except for Mr. Gashi, who the

21  Court has yet to sentence, in that he was fundamental to

22  the furtherance of the conspiracy, notwithstanding

23  defense counsel's efforts in his memorandum to

24  characterize his defendant as less than that.  I don't

25  think the record really permits another argument, as I've

1   already addressed.  I certainly think there are

2   mitigating factors here, including the defendant's family

3   who appear to be remarkable people who made every effort

4   to provide an opportunity for their son, and I think were

5   he to return to those values, it says much about what the

6   defendant could still be.  His willingness to return and

7   accept responsibility for his conduct from overseas

8   speaks to his character, and the fact that he is likely

9   to face deportation is a factor that I will consider.

10       Having said that, much of the remainder of the

11   defense brief I just don't think rings true, beginning

12   with the fact that the defendant seems to have adopted

13   two lives in this country, one that he portrayed for his

14   family and extended family and friends in that community

15   and the other that he embraced for whatever reason,

16   including the fact that he may have wanted strongly to

17   fit in.  He's a bright, talented young man, but he is

18   deserving of punishment given his role here.  And I have

19   not decided what that punishment should be.

20       I am interested in comments from the government, any

21   additional comments from defense counsel beyond the

22   memorandum, and of course comments from the defendant.

23   And I will begin with the government.  Mr. Anderson.

24       MR. ANDERSON:  Well, Your Honor, the presentence

25   investigation report again, as we've seen with many of

1    the defendants so far, does do a comprehensive job in

2    laying out the nature of the conspiracy and in particular

3    Mr. Camara's role.  It is accurate to say that without --

4    Mr. Camara and Mr. Gashi, before they got together, had

5    their own little things going on.  But this conspiracy,

6    this business was joining together to take advantage of

7    sources that Mr. Gashi ultimately had in California and

8    then ultimately some other places as well that whoever

9    other conspirators may have known as sources.

10        The defendant, not only living sort of the double

11   life that the Court referred to a moment ago, he was --

12   it appeared he was living a high standard life, a high

13   life which was -- appeared to be one of the ways that he

14   supported that high life and high standard was by his

15   earnings from the substantial marijuana purchase and

16   resale.  As other defendants in this case indicated,

17   Mr. Camara was a major -- not just a person who supplied

18   money or a person who joined with the others in -- I'll

19   use the term, although I know the Judge doesn't like

20   that -- but it was an investment, what they were doing.

21   He supplied --

22            THE COURT:  The only reason I don't like it is I

23   think it's indicative of how far astray the members of

24   the conspiracy got in thinking of themselves as --

25            THE DEFENDANT:  Legitimate?

1        THE COURT:  -- high-flying businessmen as

2   opposed to people engaged in a criminal conspiracy.

3        MR. ANDERSON:  Right.  And, you know, I could

4   speculate why they thought that this was either

5   acceptable or legitimate, but it's -- anyway, as other

6   defendants told us, he was a major contributor into the

7   money that was put into loads, which then with him

8   supplying the lion's share or say half of it, the other

9   persons that were putting money in had the benefit of

10  joining in, putting in their smaller amounts of money and

11  getting the benefit of purchase and volume which then

12  they got a volume discount; made it easier for everyone

13  else to purchase.

14      It's hard to tell where he was getting the large

15  amounts of money that he did or where the large amounts

16  of money that he got have gone we don't know, but without

17  him, without his, number one, investment, number two,

18  supplying, setting up Mr. Christmas as a transporter and

19  providing Mr. Christmas to Mr. Gashi for many of the

20  loads and helping coordinate acquisition/disposition of

21  those loads, I don't think -- the enterprise might not

22  have been as successful as it was or gotten as large as

23  it did.

24      So I think given his higher level, higher standard,

25  along with Mr. Gashi, I think the guideline range

1    determination is appropriate.  Of course the government

2    does recommend the bottom of that guideline range.

3              THE COURT:  Thank you.  Mr. Dutch.

4              MR. DUTCH:  Thank you, Your Honor.

5              THE COURT:  I should have said I've also read

6    many letters written on behalf of the defendant,

7    particularly his father's letter, but the others as well

8    from teachers and friends.  They help paint this complete

9    disconnect between one defendant and the other.  And it

10   is unfortunate there is such a dichotomy between those

11   two pictures.

12             MR. DUTCH:  So the argue -- not to rehash the

13   argument, but just to talk about Mr. Camara's role, this

14   conspiracy did not start with Mr. Camara and it didn't

15   end with him.

16             THE COURT:  I'm going to try to make this clear

17   to you, Mr. Dutch.  I agree that but for Enis Gashi, the

18   conspiracy wouldn't have gotten as big as it did.  But

19   your client was already involved in sales and he merged

20   his operation and was crucial to the larger operation.

21   That's a sad tragic fact.  And so arguing that somehow

22   the others are more responsible, I don't necessarily

23   disagree that Enis Gashi may be more responsible, but no

24   one else is more responsible than your client.  And I

25   just disagree with your characterization of the record to

1  the contrary.

2          MR. DUTCH:  And I don't think -- you know, I

3  don't want to talk -- have us talking past one another.

4  I don't think I'm denying any acceptance of his

5  responsibility.  I think we've included all of --

6          THE COURT:  Your memorandum and your comments as

7  you start out are both an attempt to characterize him as

8  somehow not as active as some others, particularly

9  Mr. Gashi, but including others who clearly were making

10 direction from Gashi and from your client.  And I just

11 have difficulty trying to paint a different picture.  I

12 think there are, as I've tried to allude to, other

13 reasons for departure, but I certainly don't think that

14 is one of them.

15         MR. DUTCH:  Well, and I wasn't -- I mean you've

16 made your ruling and I'm not asking you to reconsider

17 that ruling by any chance -- by any means and I'm not

18 trying to diminish Mr. Camara's role in this.  I guess,

19 you know, as a lawyer, it was me -- myself, not

20 Mr. Camara, that was trying to maybe split hairs and the

21 Court has said don't do that and I will move on from

22 that.

23     As far as the reason behind this, I don't think --

24 and you talk about two different personalities and I

25 could see how that would -- that that would come across

1   to the Court, but I believe that Mr. Camara, you know,

2   he's not trying to say that he had a drug -- you know,

3   was addicted to drugs or his mental health issues caused

4   this.  I think that he has stepped forward and

5   accepted --

6          THE COURT:  In fact there's no indication of

7   either of those things.

8          MR. DUTCH:  And I didn't include that.  I mean I

9   think he saw this as an ability to reach out to these

10  other people in the fraternity and to get people to

11  invest and that it was strictly a business operation as

12  part of the enterprise.  And I don't think I've ever

13  tried to deviate from that and I don't think Mr. Camara

14  has ever tried to deviate from that.  So I just wanted to

15  make sure that, you know, I'm not trying to cloud the

16  Court's judgment here.  I think he has fully accepted his

17  responsibility and whether the Court was going to go with

18  a three-level or a four-level, we were never expecting

19  anything less on that.

20         I think that the -- I've tried to highlight, and I

21  think the Court has of course picked up on the highlights

22  of the positive aspects that Mr. Camara brings.  I

23  believe that the idea that he wanted to come back to face

24  these allegations is important and the Court has already

25  mentioned that.  I'll try not to reiterate it.  But I

1   will say that he is the only one of these defendants who

2   spent time in a Hong Kong prison, a Chinese prison, and

3   then when he did get back to land in Chicago, he was

4   immediately taken into custody and he's the only one of

5   all of the defendants who has already spent time in the

6   MCC in Chicago and, prior to anybody having issues while

7   on pretrial release, spent time in a county jail.  And I

8   think that differentiates him from many of the other

9   co-defendants.

10          I --

11          THE COURT:  You raise an interesting point which

12   is I'm not sure what credit he gets for that time.  I

13   mean he essentially would have been held, even in Hong

14   Kong, on a detainer I assume.  I don't know, and I don't

15   know that probation has indicated, if he gets any credit

16   for that period of time.

17          AGENT:  I'm not sure.

18          MR. DUTCH:  I think he would get time though

19   certainly once he was taken into custody in the United

20   States.  I'm pretty sure that that would count for time.

21          THE COURT:  And to that extent it also reduces

22   how much credit I can give him since he was, after all,

23   detained overseas before being brought back.  So it's a

24   two-edge sword.

25          MR. DUTCH:  I understand that.  But I just --

1   not many people have been detained in a Chinese prison

2   and still has -- and then as the Court, to circle back,

3   talking about this dichotomy, I mean again I think it's

4   -- they're very -- there are really many positive things

5   about Mr. Camara's character that we tried to highlight.

6   We tried to provide letters, not just in support of him,

7   but I know that in speaking with the probation

8   department, there were some issues about prior employment

9   and we had to scurry a little bit.  But I believe we have

10  provided the Court ample documentation of his employment

11  record and employment history, and again, I think that

12  goes to his character as well.

13      I think that since he has been here and my getting

14  to know Mr. Camara since June, I've got to know the

15  family quite well.  I've met with his father alone on a

16  number of occasions.  I have -- you know, this is such a

17  serious allegation and a serious charge, but for this,

18  this would truly have been a Horatio Alger-type story,

19  Judge, although always with the issue hanging over his

20  head that he did not have a social security number and

21  who knows how that would have been resolved in the

22  future.

23      But I believe that Mr. Camara in his letter tried to

24  explain and we've just tried to explain that this -- his

25  involvement in this conspiracy was strictly a

moneymaker-type situation and I don't know if his life
paths have separated -- they separated at some point when
he became involved in this conspiracy, but I can say with
all honesty and with all humility that the paths that
have parted have come together or are coming together
maybe would be a better component of this; that his
family has acknowledged this and have continued to
embrace him; that Amadou has acknowledged this and has
tried to focus on the positives.  Since he's been out,
he's, although living with his parents, he still does
have an apartment in Chicago.  He has continued to study.
He has studies and he's studying for something called the
*CFA*, a Charter Financial Analysis, it's a document.  He
continues to work.  He continues to be in touch with his
family.

     So I guess, Judge, I'm happy to answer any specific
questions.  I tried to lay this out as much as possible.
I don't know if the Court sees these dichotomy coming
together since the end of his involvement in the
conspiracy.  I hope the Court has seen at least progress
towards the two roads becoming -- from being divergent to
joining.

          THE COURT:  Maybe that's a good place to turn to
the defendant, Mr. Camara.  I did read your letter and I
have tried to better understand what led you down this

path.  But it is hard to see where you left what were

fundamental values of hard work and honesty and the

importance of education instilled by your parents to how

you became an active participant in this conspiracy and

someone who was telling one story to his parents and

portraying one individual while living a very different

life elsewhere.  That's maybe the most difficult thing

for me to account for in trying to decide on an

appropriate sentence.  I'd be happy to hear anything you

wish to add.

THE DEFENDANT:  Your Honor, I want to first

start by saying I apologize for the manner in which my

actions affected my loved ones.  I know, you know, that

goes without saying.

THE COURT:  It doesn't really go without saying

and I really hope that you're not going to try to sell me

something today.

THE DEFENDANT:  No, I'm not.  I'm --

THE COURT:  Because that would really be a

mistake at this point.

THE DEFENDANT:  Yep.  I completely understand,

Your Honor.  I'm saying this for my loved ones because I

think --

THE COURT:  Well then you should say it to them

and it doesn't go without saying.

1          THE DEFENDANT:  Again, I can look at my family.

2    I'm truly sorry about how my actions have affected us.

3    You know, we come from a very religious background,

4    close-knit community, and, you know, throughout this

5    entire process and even during the time I was abroad and

6    I could return to the U.S., I could feel just the heavy

7    weight that I've put upon my loved ones and I'm truly

8    sorry about that.  I can't say that enough.

9          I don't come from a background where, you know -- my

10   parents and my family have done everything they can for

11   me.  We've come -- we came to the United States at a very

12   young age and there was never one moment that my parents,

13   my family's predis -- their predisposition prevented them

14   from moving forward.  We came here on a travel visa and

15   we stayed here as undocumented aliens.  At some point in

16   my -- with that being said, there's a certain point where

17   you lead to an area of desperation and, you know, in turn

18   that makes you forget some of the values that were

19   instilled into you.  That's not something that I should

20   have never strayed away from, but --

21          THE COURT:  I'm having trouble finding that

22   desperation in your life.  I certainly understand moving

23   from New York and a larger community of Gambian refugees

24   and others to Madison, Wisconsin, where you felt like an

25   outsider and your efforts to try to fit in.  But you did

1   that very well.  You assimilated in ways that your

2   parents had strongly encouraged and --

3           THE DEFENDANT:  I did.  And --

4           THE COURT:  And yet I don't -- I'm not hearing

5   what then led you -- what it was that motivated you the

6   way -- from someone who was a good student, who was

7   seemingly popular and had friends, to someone who thought

8   it was a good idea to start selling substantial amounts

9   of marijuana and making a lot of money.

10          THE DEFENDANT:  To address that, to be quite

11  frank with you when I got to the University of

12  Wisconsin-Madison, I was still an undocumented alien.  I

13  wrote that in my letter, explaining that there was a

14  legislation change in 2011 that basically anyone who was

15  paying instate as an undocumented citizen, you were then

16  -- you couldn't -- you weren't entitled to those benefits

17  anymore.  My parents did whatever they could, earning the

18  wage that they had, and we pulled together and we, you

19  know, attempted to afford a secondary education, which

20  was substantially expensive.

21      I was working under the table.  I had no right to

22  work in the United States.  I was still undocumented.  I

23  didn't have any opportunity to get any aid.  Most of the

24  scholarships I would have received in high school were

25  taken from me because they later learned that I had no

1   type of documentation, not a social security card or

2   anything.  I could be deported at any second.

3        So, you know, coming into college, I did whatever I

4   could to earn what I could in order to support my family.

5   But they've been through enough.  You know, as a man, at

6   some point you need to -- you make your own decisions and

7   then you need to be able to prepare for any consequences

8   that those, you know, decisions entail.  So quite frankly

9   I had a point where I didn't have some sort of -- I

10  didn't have an addiction.  I didn't -- I quite frankly

11  engaged in it because of the business opportunity behind

12  it.  And I'm not going to try to embellish --

13           THE COURT:  You had to know you were putting

14  your own immigration status in tremendous jeopardy by

15  doing it.

16           THE DEFENDANT:  I did.

17           THE COURT:  And you were by your own account

18  earning money in other ways --

19           THE DEFENDANT:  Um-hmm.

20           THE COURT:  -- in legitimate employment,

21  although I understand and could understand some

22  desperation in that you couldn't do it on the surface --

23           THE DEFENDANT:  Um-hmm.

24           THE COURT:  -- but you made a lot more money

25  than you necessarily needed to support yourself.  You

1    enlisted others, pulled them into this conspiracy.  You

2    changed your lifestyle.  I mean it's not -- it doesn't

3    come across as desperation, it comes across as greed.

4           THE DEFENDANT:  Your Honor, I understand that,

5    and with that I was very honest with my defense and

6    others I've spoken with to say that --

7           THE COURT:  Not as honest as you could have been

8    with the probation office, which didn't help your cause

9    either.  What I'm saying is you're standing up in front

10   of me and being bright and articulate and telling me a

11   story that sounds like a story.  It doesn't sound like

12   it's coming from your heart.  It doesn't sound desperate.

13   It doesn't sound all that sincere.  It may be, but your

14   letter doesn't come across that way and you're not coming

15   across that way now.  And I'm concerned for you, as much

16   as I am for an appropriate sentence that unless you

17   figure out how you got here --

18          THE DEFENDANT:  I'm trying to be as sincere as

19   possible, Your Honor, and --

20          THE COURT:  And I don't know what that says.  It

21   may be a problem with my ability to discern it; it may

22   also be a problem with you to really get in touch with

23   what's really going on inside, something that you may

24   have developed over a substantial period of time.  I

25   don't know.

1   In any event, I'm happy to hear anything else that

2   you wish to add.  I do have a few questions.

3        THE DEFENDANT:  I was just going to wrap up by

4   saying that, you know, to say that everyone, you know, in

5   this enterprise earned the same amount of money or their

6   incentive buys the same way, I don't think that's true at

7   all.  I'm not arguing responsibility, but what I can

8   truly tell you is my earnings behind all this was

9   substantially different and I -- when I finally received

10  work authorization and I was able to go on to receive

11  some strong internships and I was making money legally, I

12  developed a trend where I would try to wean myself out of

13  this.  There was no -- I can now be in the United States

14  safely and apply for positions safely within a two-year

15  period and not have to worry about being deported.

16     There was a comment said earlier that, you know, I

17  was living this some sort of high-life lifestyle.  I

18  think the only comments that were provided by people in

19  the case were just simply by the way I dressed.

20       THE COURT:  And the fact that you were traveling

21  and doing other things that aren't typical of a college

22  student.

23       THE DEFENDANT:  Yeah.  I'm involved, as you can

24  see, I'm involved in a lot of different things.  I

25  modeled for years on campus.  I never to one moment tried

1  to let my predisposition, you know, prevent me from

2  moving forward.  So in various facets I tried to, you

3  know, involve myself.

4          THE COURT:  I don't know if you can hear, but

5  you're digging yourself a hole and I don't -- it's

6  interesting that you don't understand that.  It's not

7  going to change my sentence very much, but it's

8  indicative of someone who doesn't quite understand what

9  it was they did.

10          THE DEFENDANT:  Your Honor, I apologize if I'm

11  not articulate.

12          THE COURT:  You don't need to.  What you need to

13  do is stop selling.

14          THE DEFENDANT:  I'm not trying to sell, Your

15  Honor.

16          THE COURT:  Let's try it a different way.

17          THE DEFENDANT:  Okay.

18          THE COURT:  Can you tell me where you stand with

19  your own degree?

20          THE DEFENDANT:  At the moment, and I explained

21  this in my essay, right now I haven't earned --

22          THE COURT:  Well, you did explain it, but I

23  don't understand it.  You went through the process of

24  graduating, that is to say you went through the ceremony.

25  You told your parents you had graduated.  And you knew

1  that you still had a problem with an accusation of

2  plagiarism.

3         THE DEFENDANT:  Yes, Your Honor.  It was a

4  pending paper, and as I said earlier, I did everything

5  that was told to me --

6         THE COURT:  When was the last time you spoke to

7  the University about it?

8         THE DEFENDANT:  The University?  Honestly just a

9  few weeks ago I went to the professor's office and the

10  head of the department to meet with them and they just

11  haven't gotten back to me.  I've tried to speak with them

12  on dozens of occasions.  I'm not sure if it's a professor

13  being, you know, busy or anything, but I'm still --

14         THE COURT:  It's been quite a period of time

15  since you first pursued this.  Let me ask you a second

16  question:  What were you doing in Appleton?

17         THE DEFENDANT:  In Appleton, Wisconsin?  I went

18  up to Appleton, Wisconsin, to drop off a friend who was

19  visiting me in Chicago, and, you know, I was turning

20  straight back to come back to Madison.

21         THE COURT:  Why didn't you tell your probation

22  officer?

23         THE DEFENDANT:  It didn't occur to me that

24  Appleton was outside of the district of -- the Western

25  District of Wisconsin.  And I apologize to my probation

1  officer about that.  That was completely my fault, my

2  negligence.

3           THE COURT:  What are you doing currently?

4           THE DEFENDANT:  Currently I'm involved in a

5  couple different things in Chicago.  I'm trying to --

6  I've been interviewing full time for a bunch of different

7  analyst positions.

8           THE COURT:  But you haven't been working.

9           THE DEFENDANT:  I have been working.  So as I

10  explained earlier, I'm a musician.  I DJ and I produce.

11  And then I also do contract work as an investment

12  analyst.  So the company doesn't technically hire you on,

13  but they put you on like a short-term basis with them and

14  then you, you know, you do Excel models or anything they

15  need done.

16           THE COURT:  And what do you plan to do going

17  forward?

18           THE DEFENDANT:  Going forward, to be honest I'm

19  going to continue to, you know, go to the historical

20  sciences department in order to have the professor give

21  me the green light in order for me to obtain the degree.

22  And then from there, you know, whatever happens

23  profession-wise, I want to continue to progress.  I want

24  to work.  I want to be, wherever I'm at, I want to be a

25  contributing member of society.

1    I want my family to move past this most of all.

2    They've been through so much and I just want to be in a

3    position where I'm caring for them and supporting not

4    only myself, but my loved ones through legal means and

5    not having to put them through something like this ever

6    again.

7            THE COURT:  Thank you.  I am prepared to render

8    sentence.  The defendant is a 24-year-old man who was

9    born in Gambia, Africa, and immigrated to the United

10   States with his family when he was approximately four

11   years old.  Upon entering the United States, the

12   defendant and his family moved to New York where they

13   lived for several years before arriving in Sun Prairie,

14   Wisconsin, approximately 15 years ago.  His parents

15   admirably provided him with a loving, supporting home and

16   met all his essential needs while including the benefits

17   of modeling, hard work and education.

18       The defendant adjusted seemingly well to living in

19   the United States, maybe too well to the extent that he

20   seems to have abandoned some of his parents' values, and

21   embraced a new and dishonest lifestyle.  While receiving

22   a college education at the University of Madison, the

23   defendant earned an undergraduate degree, as he

24   unfortunately led others to believe.  That degree was

25   never issued, mainly because he failed to clear up an

issue of plagiarism.  The defendant also reported that he
has maintained employment, although only some of that
employment could be verified.  I understand that partly
that may be due to the defendant's immigration status.

     The defendant has no prior criminal history.  He has
no medical problems, although he recently reported
treatment for psychotropic medication with respect to an
attention deficit hyperactivity disorder.  The defendant
also has no meaningful history of substance abuse.  His
crime here appears to be motivated by greed and
dishonesty.  He has engaged in a cycle of repeated lies
or mistruths in order to cover or conceal earlier
fraudulent statements.  As a result, the defendant's
felony conviction in this case may well result in
deportation.

     In December of 2013, law enforcement learned that
members of various fraternities at the University of
Wisconsin-Madison, among others, were involved in
purchasing and transporting large quantities of
marijuana.  The conspiracy involved individuals who
collectively invested as much as $80,000 for the purchase
of the marijuana in California and Colorado.  Others that
were involved in the conspiracy transported the marijuana
to Wisconsin were paid for their assistance.  Many of the
individuals involved in this jointly undertaken criminal

1    enterprise had been classmates at a local high school.

2    From October 2012 to January of 2015, the defendant

3    and other conspirators arranged for the transportation of

4    marijuana on at least 18 occasions.  The total amount of

5    marijuana transported was approximately 500 pounds.  As

6    already addressed, the defendant was central to this

7    conspiracy.  He organized shipments on a number of

8    occasions and recruited drivers when necessary.  The

9    combined weight of the marijuana attributable to the

10   defendant's relevant conduct totals 228 pounds or 103.42

11   kilograms.

12   Taking into consideration the nature of the offense

13   as well as the defendant's personal history and

14   characteristics, I am persuaded that a custodial sentence

15   of 30 months is reasonable and no greater than necessary

16   to hold the defendant accountable, protect the community,

17   provide the defendant the opportunity for rehabilitative

18   programs, and achieve parity with the sentences of

19   similarly situated offenders.

20   As to Count 1 of the Information, it is adjudged

21   that the defendant is committed to the custody of the

22   Bureau of Prison for a term of 30 months.  I recommend

23   that the defendant receive educational and vocational

24   training as well as mental health and substance abuse

25   treatment.  It is recommended that the defendant be

1   afforded pre-release placement in a residential re-entry

2   center with work release privileges in the event that he

3   is not deported.  At least a three-year term of

4   supervised release is required by statute.  The term of

5   imprisonment will be followed by a three-year term of

6   supervised release subject to the standard conditions.

7          In light of the nature of the offense and the

8   defendant's personal history, I adopt those standard and

9   special conditions proposed in the presentence report,

10  noting that neither party raised any objections to those

11  proposals despite being given advance opportunity to do

12  so.  Pursuant to the Sentencing Reform Act of 1984, the

13  primary goals of supervised release are to assist the

14  defendant's transition into the community after a term of

15  imprisonment and to provide rehabilitation.  Supervision

16  in this case will provide the defendant with needed

17  correctional programming which will include

18  rehabilitative programs, to assist with community

19  reintegration, afford adequate deterrence to criminal

20  conduct, and protect the public from further crimes

21  perpetrated by the defendant.

22         Specifically the defendant shall be subject to

23  Conditions Nos. 9 through -- 1 through 9 and 12 through

24  15 as outlined and justified in the appendix to the

25  presentence report.  These conditions are warranted

1   because the defendant was involved in a conspiracy that

2   distributed in excess of 100 kilograms of marijuana into

3   the Madison area.  The defendant and his co-defendants

4   were obtaining marijuana from a source in California and

5   the defendant recently traveled nationally and

6   internationally.

7       The defendant is from Gambia and will be facing an

8   immigration judge regarding his deportation status

9   because of this instant conviction.  He has graduated

10  from high school and taken numerous courses at the

11  University of Wisconsin and should be very close to

12  employment and getting his degree, but he does not have

13  fixed employment and he has at least some history of

14  alcohol and marijuana use, although I do not believe that

15  drug testing is required and find that is not necessary

16  under the circumstances here.

17      It is adjudged that the defendant is to pay a $100

18  criminal assessment penalty to the Clerk of Court for the

19  Western District of Wisconsin immediately following

20  sentencing.  I also find that the defendant has -- does

21  not have the means to pay any further fine under Section

22  5E1.2 without impairing his ability to support himself

23  upon release from custody and so I impose no fine.

24      The U.S. Probation Office is to notify law

25  enforcement agencies and the state attorney general of

the defendant's release back into the community.  But I
do find and I did reduce the sentence here because of the
real opportunity that the defendant still has to lead a
meaningful life, a life that will make his parents proud.
Whether it is here or in Gambia, there is so much that
still is available to this defendant.  And for those
reasons, I did depart under Section 5K2.0.

There is still the matter of the defendant's
continued release.  Despite his not having established
permanent employment, my understanding is that he has
generally complied with the requirements of probation
with the exception of this inexplicable decision to drive
to Appleton, Wisconsin, and given his lack of criminal
history and his continued compliance, I would consider
continued release subject to the defendant understanding
how important his continued compliance with the terms and
conditions of release are.  It would be devastating to
any possibility of remaining in this country if he were
not -- if he were to fall out of compliance.  And I'll
also hear from the government if they wish to argue,
unlike the other defendants, this defendant is deserving
of immediate custody.

MR. ANDERSON:  I don't think Mr. Camara should
be treated differently than the other defendants, so in
that respect I understand.

1          THE COURT:  All right.  Mr. Camara, I want to

2    emphasize the benefits of your being able to self-report,

3    which I will order that you do 30 days from today between

4    the hours of 10 and 2 p.m., subject to a specific

5    designation of place of reporting.  It will increase the

6    likelihood that the Bureau of Prisons will find an

7    appropriate placement for you given your lack of criminal

8    history or any violent past.  I am hopeful that you will

9    be placed at a camp appropriate to your circumstances and

10   that you can immediately get started with the work that I

11   think you still need to do.  You are clearly articulate

12   and bright and have the ability to do an awful lot with

13   your life.  You've now been saddled with a felony, but

14   that has not prevented a lot of other people under much

15   worse circumstances from doing something with their life.

16        I would urge you to get your degree situation

17   addressed as soon as possible.  I would urge you to do as

18   much reading as you can while incarcerated and to begin

19   to put a plan together that will ensure a real healing,

20   not only for yourself, but for your parents that

21   addresses whatever are the underlying causes of the

22   decisions that you make and develop a plan that will

23   persuade immigration to let you stay in this country.

24   You can certainly include my name as among those who

25   would act as a general reference for you.  I don't see a

1  benefit to your being deported at this point.  But that

2  is not a decision for this court.

3      I do see you as someone who has been held

4  responsible for your conduct and I can only urge you to

5  consider the possibility that you need to better

6  integrate your past, which should be a proud past, with

7  your present and that you live one life whole and with

8  integrity.  If you do that, I have no doubt that there's

9  any number of things that you can still do to make your

10  family proud, to contribute to the community, and most

11  importantly to make yourself proud, really proud as

12  opposed to the superficial aspects of success.

13      With that said, I'll hear if there is anything more

14  the government wishes to do.  I don't know that you need

15  to move to dismiss the Indictment.  You replaced it with

16  the Indictment [verbatim].

17          MR. ANDERSON:  Since he pled to the Information,

18  I do need to move to dismiss the Indictment, yes.

19          THE COURT:  All right.  That motion is granted.

20  Mr. Camara, I am obligated and I do tell you that you

21  have a right to appeal this Court's sentence.  You have

22  very capable counsel who can explain the possible grounds

23  for an appeal and the short time you have to file a

24  notice of appeal, which is 14 days.  Again, my hope is

25  that this can be the beginning of healing and of progress

1   for you and that having served your debt to society, you

2   will come out of and be treated as someone who still has

3   much to give to society.

4        Is there anything more for the defense at this time?

5            MR. DUTCH:  No, Judge.

6            THE COURT:  All right.  We'll stand in brief

7   recess.

8        (Proceedings concluded at 2:09 p.m.)

9

10                      *  *  *  *  *

11          I, LYNETTE SWENSON, Certified Realtime and
    Merit Reporter in and for the State of Wisconsin, certify
12  that the foregoing is a true and accurate record of the
    proceedings held on the 2nd day of February 2016 before
13  the Honorable William M. Conley, Chief Judge for the
    Western District of Wisconsin, in my presence and reduced
14  to writing in accordance with my stenographic notes made
    at said time and place.
15  Dated this 17th day of March 2016.

16

17                      ___/s/_____

18                      Lynette Swenson, RMR, CRR, CRC
                        Federal Court Reporter

19

20

21

22

23  The foregoing certification of this transcript does not
    apply to any reproduction of the same by any means unless
24  under the direct control and/or direction of the
    certifying court reporter.

25